PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
David W. Reid, Bar No. 267382
dreid@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff and the Putative Class

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SILVIA GARCIA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BLUE NILE, INC., a Delaware corporation, d/b/a WWW.BLUENILE.COM,<br><br>Defendant. | Case No. 2:25-cv-10130-JAK-MAA<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

## I. INTRODUCTION

1. This case involves an outrageous privacy "bait and switch" scheme: Defendant lures visitors to visit its website at: https://www.bluenile.com (the "Website") by assuring them that "[w]e value your privacy." *See* https://www.bluenile.comom/policies/privacy (last visited Sept. 2025). In reality, Defendant secretly allows notorious data brokers to (1) intercept communications from visitors and (2) use those communications to compile and sell deeply personal details about visitors to the highest bidders. The predictable result is a grave intrusion upon visitor privacy.

2. The CEO of the world's largest data broker recently bragged about the suffocating extent to which data brokers secretly track internet users. Referring to a typical web user as "Lola," he boasts: "***We know who she is, what she watches, what she reads, and who she lives with. Through the power of connected identity, we also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that Lola has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that Lola's income has not been keeping pace with inflation.***"[1]

3. Putting profits over privacy, Defendant has partnered with data brokers—Claritas, Neustar, and Magnite -- and other third-party spyware developers—to secretly install either "Tracking Pixels" or third-party cookies on its Website. Defendant secretly allowed these companies to intercept visitor communications for the tortious purpose set forth below without Plaintiff's knowledge or consent. In doing so, Defendant has violated California Penal Code § 638.51 and other provisions of law.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because it has original federal question jurisdiction.

---

[1] Lucas Ropek, ***Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users***, March 15 2025 (Gizmodo.com).

5. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

6. Defendant is subject to personal jurisdiction because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."

## III. <u>PARTIES</u>

7. Plaintiff is a resident and citizen of California.

8. Defendant is a Delaware corporation that sells jewelry to customers in California via its Website. Defendant does business throughout the United States deriving substantial revenue from interstate commerce.

## IV. <u>FACTUAL ALLEGATIONS</u>

### A. <u>Defendant Secretly Partners with Multiple Data Brokers and Other Third Party Entities to Track Visitors and Sell Their Personal Information To the Highest Bidders.</u>

9. Defendant operates the Website.

10. On or about November 5, 2025, Plaintiff, by and through a computer expert, conducted an investigation of the Website, which confirmed that third-party cookies are stored on the visitor's browser when visiting the Website. Although the Website displayed a cookie banner at the time of such November 5, 2025 visit, Plaintiff's computer expert has determined that at the time of Plaintiff's visit to the Website in September 2024, the Website ***lacked any cookie banner or consent management platform ("CMP") displayed on the homepage of the Website***. That is, before a visitor could even review the Website's Privacy Policy, the Website's third parties cookies were loading and operational and stored on a visitor's Internet browser and/or hard drive. Thus, visitor data was harvested and shared with third-party services immediately upon webpage loading, preceding any opportunity for visitors to consent to or decline the Website's Privacy Policy, which was purportedly last updated on February 22, 2024.

11. A screenshot created on November 5, 2025 identifying the third party cookies stored on the Internet browser when visiting the Website is depicted below:




| Name | Domain | Type | Platform | Status | Recommendation |
|---|---|---|---|---|---|
| addshoppers | shop.pe | Social | AddShoppers | Allowed | Contact third-party site for ... |
| ab | .agkn.com | Advertising | Aggregate Knowledge | Allowed | Contact third-party site for ... |
| ad-id | .amazon-adsystem.com | Advertising | Amazon Ads | Allowed | Contact third-party site for ... |
| ad-privacy | .amazon-adsystem.com | Advertising | Amazon Ads | Allowed | Contact third-party site for ... |
| uuid2 | .adnxs.com | Advertising | AppNexus | Allowed | Contact third-party site for ... |
| anj | .adnxs.com | Advertising | AppNexus | Allowed | Contact third-party site for ... |
| MUID | .bing.com | Advertising | Bing Ads | Allowed | Contact third-party site for ... |
| MR | .bat.bing.com | Advertising | Bing Ads | Allowed | Contact third-party site for ... |
| MR | .c.bing.com | Advertising | Bing Ads | Allowed | Contact third-party site for ... |
| SRM_B | .c.bing.com | Advertising | Bing Ads | Allowed | Contact third-party site for ... |
| CLID | www.clarity.ms | Utility | Clarity | Allowed | Contact third-party site for ... |
| SM | .c.clarity.ms | Utility | Clarity | Allowed | Contact third-party site for ... |
| MUID | .clarity.ms | Utility | Clarity | Allowed | Contact third-party site for ... |
| MR | .c.clarity.ms | Utility | Clarity | Allowed | Contact third-party site for ... |
| ANONCHK | .c.clarity.ms | Utility | Clarity | Allowed | Contact third-party site for ... |
| uid | .criteo.com | Advertising | Criteo | Allowed | Contact third-party site for ... |
| dbln | .facebook.com | Social | Facebook | Allowed | Contact third-party site for ... |
| datr | .facebook.com | Social | Facebook | Allowed | Contact third-party site for ... |
| sb | .facebook.com | Social | Facebook | Allowed | Contact third-party site for ... |
| c_user | .facebook.com | Social | Facebook | Allowed | Contact third-party site for ... |
| xs | .facebook.com | Social | Facebook | Allowed | Contact third-party site for ... |
| fr | .facebook.com | Social | Facebook | Allowed | Contact third-party site for ... |
| ar_debug | .facebook.com | Social | Facebook | Allowed | Contact third-party site for ... |
| test_cookie | .doubleclick.net | Advertising | Google/Doubleclick Ads | Allowed | Contact third-party site for ... |
| IDE | .doubleclick.net | Advertising | Google/Doubleclick Ads | Allowed | Contact third-party site for ... |
| __Host-3PLSID | accounts.google.com | Utility | Other Google APIs/SDKs | Allowed | Contact third-party site for ... |
| __Secure-3PSID | .google.com | Utility | Other Google APIs/SDKs | Allowed | Contact third-party site for ... |
| __Secure-3PAPISID | .google.com | Utility | Other Google APIs/SDKs | Allowed | Contact third-party site for ... |
| NID | .google.com | Utility | Other Google APIs/SDKs | Allowed | Contact third-party site for ... |
| __Secure-3PSIDCC | .google.com | Utility | Other Google APIs/SDKs | Allowed | Contact third-party site for ... |
| ar_debug | .pinterest.com | Social | Pinterest | Allowed | Contact third-party site for ... |
| _pinterest_ct_ua | .ct.pinterest.com | Social | Pinterest | Allowed | Contact third-party site for ... |
| g | .creativecdn.com | Advertising | RTB House AdPilot | Allowed | Contact third-party site for ... |
| ar_debug | .creativecdn.com | Advertising | RTB House AdPilot | Allowed | Contact third-party site for ... |
| khaos | .rubiconproject.com | Advertising | Rubicon Project | Allowed | Contact third-party site for ... |
| audit | .rubiconproject.com | Advertising | Rubicon Project | Allowed | Contact third-party site for ... |
| cdv | recommender.scarabresear... | Analytics | Smart Insight Tracking | Allowed | Contact third-party site for ... |
| s | recommender.scarabresear... | Analytics | Smart Insight Tracking | Allowed | Contact third-party site for ... |
| TDID | .adsrvr.org | Advertising | The Trade Desk | Allowed | Contact third-party site for ... |
| TDCPM | .adsrvr.org | Advertising | The Trade Desk | Allowed | Contact third-party site for ... |
| _ttp | .tiktok.com | Social | TikTok | Allowed | Contact third-party site for ... |
| barometric[cuid] | .trkn.us | Other | Unknown | Allowed | Contact third-party site for ... |
| barometric[idfa] | .trkn.us | Other | Unknown | Allowed | Contact third-party site for ... |
| ids_v1 | .r2net.com | Other | Unknown | Allowed | Contact third-party site for ... |
| PAPVisitorId | .r2net.com | Other | Unknown | Allowed | Contact third-party site for ... |
| vcnpxid | nytmg.com | Other | Unknown | Allowed | Contact third-party site for ... |
| vcnpxst | nytmg.com | Other | Unknown | Allowed | Contact third-party site for ... |

12. The foregoing screenshot image is of the browser's developer tools, which allows inspection of third-party cookies stored on the user's device by a website that the user is visiting. This tool reveals the cookie's name, the domain that sets it, its category or purpose, and the platform with which it is associated.

13. Third-party cookies can only be set by the third-party server itself and not by the website directly. Thus, if a third-party cookie is present, then this means that a tracking script from that third party was loaded and successfully executed on the site.

14. Once the script runs, it sends user data to the third party's server. In response, the server sets a cookie in the browser. This cookie allows the third party to recognize and track the user during future visits even across different websites.

15. As described further below, the Website has embedded the software code of multiple data brokers registered with the California Privacy Protection Agency. According to the esteemed Brennan Center for Justice, data brokers are "the main purveyors of surveillance capitalism" that "collect, assemble, and analyze personal information to create detailed profiles of individuals, which they then sell to "financial institutions and insurance firms….Advertising companies… predatory loan companies, stalkers, and scammers…foreign actors…and law enforcement and other government agencies including the FBI and the IRS."). *See* https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last visited Nov. 12, 2025).

**1. <u>Claritas</u>**

16. Claritas LLC ("Claritas") is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Nov. 11, 2025).

17. Claritas is a company that provides data and solutions for marketers, primarily focused on identifying target audiences and optimizing marketing campaigns. Claritas offers a wide range of data assets, including demographic and behavioral information, multicultural data, and a proprietary Identity Graph.

18. The Website sends a request to Claritas servers (trkn.us) to track visitor activity and stores tracking cookies on the user's browser to monitor activity over the next 365 days.



19. Claritas tracks a user's IP address. The following screenshot depicts the search results for requests sent that contain the visitor's IP address, which includes Claritas (trkn.us):




**2. <u>NeuStar</u>**

20. NeuStar, Inc. ("NeuStar") is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Nov. 12, 2025).

21. NeuStar was formerly doing business as Aggregate Knowledge – agkn.com.

22. Neustar's Customer Experience services connect data and media across channels (online, offline, television, etc.) to enable marketers to analyze visitor behavior to create segmented audiences for targeted marketing campaigns. Visitor devices are fingerprinted, and devices identified as being associated with users are tracked and unified into a single behavioral profile. Tracking is not limited to digital interaction; physical and offline activities are tracked and used to further build a predictive psychological profile for visitors.

23. Web beacons are sent to Neustar servers to track visitor activity, they send external user IDs to synchronize user data with third-party platforms, and they store third-party tracking cookies on the browser for one year.




## 3. Magnite

24. Magnite is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Nov. 11, 2025).

25. Magnite was formerly doing business as Rubicon Project and Tremor Video.

26. Magnite tracks a user's precise geolocation as depicted on the website of the California Privacy Protection Agency.

| Business Name (Doing Business As) | Email | Website | Minors | Precise Geolocation | Reproductive Healthcare Data | |
|---|---|---|---|---|---|---|
| Magnite Inc | privacy@magnite.com | https://www.magnite.com | No | Yes | No | View |

27. A web beacon is sent to Magnite servers to track visitors and synchronize cookie data with external platforms (TheTradeDesk). Tracking cookies are stored on the browser, allowing users to be identified and online activity tracked for the next 365 days.




## 4. TikTok

28. The Website monitors visitor activity and sends requests to the TikTok platform, enabling TikTok to identify visitors and track behavior with hyper-granular details.

29. Web beacons are sent to TikTok servers to track visitor activity and enrich data using a visitor’s IPv6 address. Additional data tracked includes the page URL viewed, device type, device IPv4 address, device user agent, event timestamp, page view unique ID, session unique ID, message event unique ID, and user tracking IDs.




30. The TikTok _ttp tracking cookie is used to collect data about users for the purposes of delivering targeted interest-based ads. Below is a screenshot of the first-party and third-party cookie stored on the visitor's browser.

| Name | Value | Domain | Path | Expires / Max-Age |
|---|---|---|---|---|
| _ttp | 32bdZl00gj6arCiX5L1iBOuOGRu | .tiktok.com | / | 2026-10-07T16:07:43.534Z |
| _ttp | 01K4ZAXFXHZ3C95CY818N87EJD_.tt.1 | .bluenile.com | / | 2026-10-07T16:07:43.000Z |

5. **<u>Facebook</u>**

31. The Website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes. External user IDs are contained in the data payload to synchronize visitor data across third-party ad platforms.



32. Requests are sent to Facebook servers to track visitor activity on the Website. If users are logged in, the third-party Facebook cookies are loaded and sent with the requests. The c_user cookie is sent with the request, allowing Facebook to identify the user's account that is visiting the Website.



33. The Meta _fbp cookie is a Facebook identifier that is set by Facebook's source code which is stored as first party cookie data and able to track users over the next 90 days.

| Name | Value | Domain | Path | Expires / Max-Age |
|---|---|---|---|---|
| _fbp | fb.1.1757693264899.6829913182572... | .bluenile.com | / | 2025-12-11T16:07:44.000Z |

**6. <u>Criteo</u>**

34. Criteo is a digital advertising platform that collects and aggregates user data so advertisers can target users to deliver interest based advertisements to their devices. Below is a screenshot from Criteo's privacy policy, demonstrating what this looks like in practice.

**Practical example**

Here is one way our technology allows us to provide you with ads that may be of interest to you:

**When users visit an Advertiser website using our technologies, data relating to their browsing events are collected.**

*Example of data collected by Criteo:*

- *The user with the cookie identifier 123f94d8-a745-4f8b-a1d0-bf6fbbd60058 (let's name it "Criteo ID 123" for convenience) viewed product A on 01/01/2018 at 13:37 while browsing www.example-advertiser.com.*

**Our technologies compare these data with the aggregated data available on the Advertiser's website.**

*Example of aggregated data available:*

- *In general, users who purchased Product A on www.example-advertiser.com also purchased Product B on this website*
- *In general, Product C is popular on this website*

**When users browse a Publisher website, we are informed of the availability of advertising spaces.**

*Example of data collected by Criteo:*

- *An advertising space with the following characteristics (size, visibility, etc.) is available on www.example-publisher.com that the Criteo ID 123 is about to browse*

**Then our algorithms determine the relevance for buying the advertising space and displaying a personalized ad on it.**

*Example of decision that would be taken by Criteo: Buy the advertising space available on www.example-publisher.com and display an ad featuring the following products:*

- *Product A, because the user with the Criteo ID 123 showed interest in it during a recent session*
- *Product B, because the user with the Criteo ID 123 is likely to be interested in this product since he/she has viewed product A during a recent session*
- *Product C, because this product is popular.*

35. A request is sent to Criteo servers (https://sslwidget.criteo.com/event) to track visitor activity on the Website. The payload contains the website domain, page URL viewed, user IDs, and cookie IDs for TikTok and Facebook.




36. Third-party tracking cookies are stored on the browser, allowing Criteo to record visitor browsing activity across multiple sites for the next 13 months.

| Name | Value | Domain | Path | Expires / Max-Age |
|---|---|---|---|---|
| cto_bundle | vhqhTl9xRXd5N3FWZzVqcE1n... | .criteo.com | / | 2026-10-07T16:12:27.410Z |
| uid | 3a57c425-fcf2-46bc-80f5-0f8... | .criteo.com | / | 2026-10-07T16:12:28.306Z |

**7. <u>TheTradeDesk</u>**

37. The Trade Desk, Inc. is an American multinational technology company that specializes in real-time programmatic marketing automation technologies, products, and services, designed to personalize digital content delivery to users.

38. Requests are sent to TheTradeDesk servers (https://match.adsrvr.org/track) to synchronize user cookie data in an attempt to match visitor identities with advertising partners. The request also includes the page the visitor is on and tracking cookies are stored on the browser and allow TheTradeDesk to identify visitors across other sites for one month.




39. Third-party advertising partners include Xandr (AppNexus), Google, and Magnite (Rubicon Project).




**8. <u>Xandr</u>**

40. Xandr is a Microsoft-owned data aggregation company that operates an online platform for buying and selling consumer data for digital advertising campaigns.

41. Xandr was formerly doing business as AppNexus.

42. When a visitor accesses a website using Xandr, a request is sent to the Xandr tracking URL (adnxs.com), which allows Xandr to gather data about the user's device and location. The X-Proxy-Origin in the response header reveals the device's IP address, which identifies the geographic region from where the request originated.

43. A user IP address in the X-Proxy-Origin response header and tracking cookies stored on the browser, and a cookie syncs with TheTradeDesk as depicted in the screenshot image below:




## 9. PebblePost

44. PebblePost is a programmatic direct mail advertising service that collects user intent data to target individuals with direct mail campaigns. By utilizing their proprietary identity graph known as the "PebblePost Graph," they track visitors through the integration of billions of first-party household, online intent, and transaction data points. This process enables PebblePost to accurately identify the physical addresses of visitors for the purpose of distributing marketing materials.

45. "Programmatic Direct Mail blends digital and direct mail to convert consumers and move them along the customer journey. It does this by turning their recent online signals and intent into digitally enhanced direct mail…Use PDM Retargeting to identify your anonymous site visitors, and reach them at home with a piece of relevant, impactful mail within 2-3 days of their site activity, when your brand is still top of mind." https://www.pebblepost.com/blog/supercharge-customer-journey-pdm/#decision

46. "PebblePost sends hundreds of thousands of pieces of programmatic direct mail each day to people who visit its clients' websites. CEO Jacob Ross talks with Marketecture's Ari Paparo about how it uses online identifiers to match anonymous site visitors to home addresses." https://news.marketecture.tv/p/pebblepost-jacobross?id=pebblepost-jacobross

47. Web beacons are sent by the PebblePost tracking pixel to track visitor activity and synchronize user cookie data (ppid) with third-party platforms (Tapad) to identify Website visitors and segment them into marketing groups.




## 10. Google Ads

48. Google Ads remarketing, also known as retargeting, allows businesses to show ads to users who have previously visited their website or interacted with their app.

49. Web beacons are sent out to DoubleClick when visitors load a page on the Website. These requests can identify the specific page view, the specific web session,

the individual user, the type of device, which browser and what version, and the specific time the visitor viewed the page.




50. Tracking is allowed to continue across multiple sessions by storing the IDE tracking cookie on the visitor's browser for 13 months.

| Name | Value | Domain | Path | Expires / Max-Age |
|---|---|---|---|---|
| IDE | AHWqTUktnAE4xZTOOXk-k5FAlJy8V... | .doubleclick.net | / | 2026-10-17T16:07:45.385Z |

51. Another request is sent to synchronize user cookie data with TheTradeDesk.

▾ General

| | |
|---|---|
| Request URL | https://cm.g.doubleclick.net/pixel?google_nid=TheTradeDesk&google_cm&google_sc&google_hm=ZjI2NjNjOWYtMTc3NC00NjUzLTkyYzItMGNmNTYwOTRiYzA4&gdpr=0&gdpr_consent=&ttd_tdid=f2663c9f-1774-4653-92c2-0cf56094bc08 |
| Request Method | GET |
| Status Code | 302 Found |
| Remote Address | 142.250.217.130:443 |
| Referrer Policy | strict-origin-when-cross-origin |

### 11. Microsoft / Bing

52. A request is sent to the Microsoft service Bing.com to behaviorally track visitors, reporting content they have viewed across their session on the Website. After the request is processed by Bing, the server assigns visitors a machine unique identification value that allows for enhanced visitor identification and tracking across multiple website sessions.



53. The MUID cookie is used for marketing/advertising and identifies unique web browsers to store and track visits across websites. The tracking cookie is stored on the visitor's browser for a year.

| Name | Value | Domain | Path | Expires / Max-Age |
|---|---|---|---|---|
| MR | 0 | .c.bing.com | / | 2025-09-19T16:07:47.272Z |
| MR | 0 | .bat.bing.com | / | 2025-09-19T16:07:44.128Z |
| MUID | 0D999249B168695C019F842CB002... | .bing.com | / | 2026-10-07T16:07:47.271Z |
| SRM_B | 0D999249B168695C019F842CB002... | .c.bing.com | / | 2026-10-07T16:07:47.272Z |

**12. <u>AddShoppers / SafeOpt</u>**

54. AddShoppers/SafeOpt is a robo-marketing platform for sending marketing emails to user's that "engage" with a company's website. The way it works is that if a user signed up for an email list for a site that uses SafeOpt, then other sites can send marketing emails once a user visits their site. The SafeOpt website states:

> "Our system allows for participating brands to contact you by email after you have engaged on their website without revealing your email to them"
>
> "Don't remember signing up through our website directly? Then you must have joined SafeOpt through one of our many publisher or brand partners' sites. We have a partner network with 2,000+ large brands and publishers. When people sign up for emails on a site in our partner network, they can join our network at the same time."

55. Below is a request sent to SafeOpt/AdShoppers servers (shop.pe) to track visitor activity on the Website, stores tracking cookies, and sends cookie values in an attempt to identify visitors.




| Name | Value | Domain | Path | Expires / Max-Age |
|---|---|---|---|---|
| addshoppers | "2\|1:0\|10:1757693548\|11:add... | shop.pe | / | 2026-10-17T16:12:28.282Z |
| addshoppers.co... | 2%7C1%3A0%7C10%3A1757... | www.bluenile.com | / | 2026-10-17T16:12:28.167Z |

56. The foregoing cookies and pixels were placed on the visitor's browser as opposed to a visitor's visit to a different website by preserving a copy of the network log during such expert's investigation of the Website. Such network log clearly shows the requests to the pixel and third party cookie services were made on behalf of the Website and not already on the visitor's browser.

57. The foregoing Tracking Pixels (and third party cookies embedded onto visitor browsers after visiting the Website) are not merely analytics tools — they are

powerful surveillance mechanisms designed to identify and follow users across devices, sessions, and even websites, using a technique known as cross-device attribution. Here's how it works: **First**, when Plaintiff visited the Website, the Tracking Pixels (and third party cookies) were secretly loaded and covertly captured numerous device-specific attributes (including IP address, browser type and version, operating system, screen resolution, fonts and plugins, time zone, language, and hardware IDs). These data points were used to create a unique fingerprint of Plaintiff's device. **Second**, once the Tracking Pixels (and third party cookies) collected this fingerprint and associated it with Plaintiff, they were able to link Plaintiff's activity across different devices (e.g., laptop → mobile phone), different browsers (e.g., Chrome → Safari), and different websites and sessions (e.g., visiting news site → shopping site) through both probabilistic and deterministic methods. **Third**, the Tracking Pixels (and third party cookies) were invisible to Plaintiff, as there was no visible indication that the Tracking Pixels (and third party cookies) were present, and Plaintiff was not informed of the Tracking Pixels (and third party cookies) or their purpose on the Website before such Tracking Pixels (and third party cookies) were active on the Website ***even before a user even interacted with the Website's privacy policy***. **Fourth**, Defendant and the data brokers collected and linked this cross-device data, and then sold or shared it with third parties (advertisers, etc.), used to build consumer dossiers, including interests and habits, and fed into real-time bidding systems to target users with tailored ads.

58. In short, the use of Tracking Pixels (and third party cookies) on the Website is a surreptitious and invasive surveillance practice. Through cross-device attribution, Tracking Pixels (and third party cookies) enable data brokers and their clients to secretly follow Plaintiff across Plaintiff's digital life, without consent, visibility, or meaningful choice. In the context of privacy law, this practice is not only deceptive—it is profoundly intrusive and highly offensive to a reasonable person, especially when conducted under Defendant's false pretense to protect and respect Plaintiff's privacy, as described above.

**B. <u>Defendant's Privacy Policy Acknowledges the Website's Sharing of Personal Information of California Residents to Third Parties.</u>**

59. The Website's Privacy Policy purportedly last updated on February 22, 2024, *see* https://www.bluenile.com/policies/privacy, has a section with a heading, "Interest-Based Advertising Choices," whereby the Privacy Policy states in relevant part as follows:

> "We collect information about your use of the Services through cookies, pixels, log files, or other similar technologies to review or improve the usage and operations of our website, to analyze trends and track user's movement around the Website, to administer the Website and ***to provide you with advertising about products and services tailored to your individual interests***. We also may obtain information for this last purpose from third-party websites on which our ads are served. ***You may see our ads on third-party websites or apps because we use third-party ad networks to serve our ads***.
>
> ***The networks use this information to show you advertisements that may be tailored to your individual interests***. The information our ad networks may collect on our behalf includes data about your visits to websites that serve our advertisements, such as the pages or advertisements you view and the actions you take on the websites (e.g., if you click the ad). This data collection takes place both on our Website and other online Services, and on third-party websites that participate in these ad networks."

https://www.bluenile.com/policies/privacy (emphasis added). Thus, the Website's Privacy Policy freely acknowledges engaging in targeted advertising by collecting visitor's personal information from their usage of the Website.

60. Within such Privacy Policy is a "Notice at Collection," which states in relevant part, "**We collect the following categories of personal information, including within the prior 12 months**:

…

- **Internet or other Electronic Network Activity Information (including usage and technical information):** This includes information about your use of the Services, including your Internet Protocol ("IP"), unique device identifier, device characteristics, system settings and preferences, search queries, referring URLs, and the time and date of your usage. We also collect and store information about your preferences, how you interact with our Services, and how you interact with emails that we send to you. We may link certain data elements we have collected, such as your browser information, with other information we have obtained about you. This data will be sold or shared as described in more detail in our Policy.
- ***Geolocation Data:*** This includes information about the location of the devices used to access the Services ("Location Data"). Location Data includes: (a) the location of the mobile device or tablet derived from GPS or WiFi use; (b) the IP address of the mobile device or tablet or internet service used to access the Services; and (c) other information made available by a user or others that indicates the current or prior location of the user, such as geotag information in photographs. This data will be sold or shared as described in more detail in our Policy.

…

- ***Inferences Drawn from the Above:*** We collect profile inferences that we draw from your information and web activity to create a personalized profile so we can better identify goods and services that may be of interest to you. This data may be sold or shared as described in more detail in our Policy."

https://www.bluenile.com/policies/privacy (emphasis in original).

61. Within such Privacy Policy is a "Notice at Collection," which further states in relevant part, "**What are the purposes for which we collect and use your personal information?**

…

- To provide you with customized content, targeted offers, and advertising on the Website and across other third-party sites…."

https://www.bluenile.com/policies/privacy (emphasis in original).

62. The Website also contains a Cookies Policy, which the topic of targeted advertising by stating in relevant part as follows:

"Third parties may drop cookies on your computer or mobile device to serve advertising through our Website. These companies may use information about your visits to this and other websites ***in order to provide relevant advertisements about goods and services that you may be interested in***."

https://www.bluenile.com/policies/cookies-policy (emphasis added).

63. The Website's Cookies Policy poses the question, "**How do we use cookies?**," and responds in relevant part by stating:

"We use cookies to:

…

• Customize and enhance your online experience."

https://www.bluenile.com/policies/cookies-policy

## C. The Current Version of the Website's Cookie Banner and CMP Are Misconfigured.

64. The current version of the Website displays a cookie banner on the homepage of the Website with a purported hyperlink to a CMP.

65. Plaintiff's expert has confirmed that the cookie banner and CMP's hyperlink therein that currently exist on the Website, which were installed sometime after Plaintiff's visit, are misconfigured because the desktop version of the Website loads a Google "Top Quality Store Badge" that prevents and blocks the ability of a user to click on the "Privacy Policy" hyperlink, the "Cookies Notice" hyperlink, and the "Do Not Sell My Personal Information" hyperlink displayed in the current version of the Website. The "Do Not Sell My Personal Information" hyperlink is intended to constitute a hyperlink to the

Website's CMP, which, in theory, would allow users to opt-out of tracking from non-essential cookies or pixels.

66. In particular, the blue square in the screenshot image below is the size of the badge element, which is 450 x 150 pixels. This covers the options in the cookie banner and prevents a user of the Website from the ability to click on any such hyperlinks.




**D. <u>Browser Cookies Persist Even If a User Opts-Out of Non-Essential Cookies.</u>**

67. If the developer tools are used to remove the aforementioned Google badge, allowing the ability to opt-out and reject the use of non-essential cookies, the pre-consent spyware no longer fires on the Website thereafter. While the spyware no longer tracks users on the Website itself if a visitor successfully opts-out of non-essential cookies, the third party cookies that were loaded onto the visitor's browser storage before consent are not removed from the browser's storage, which is problematic because the third party spyware platforms are still able to track and identify users across other sites that also use the same service. That is, the third party cookies deployed pre-user consent allow cross-

site tracking to occur because they continue to exist in the user's browser storage. Below is a screenshot of the tracking cookies still stored on the browser after all non-essential cookies have been rejected.




68. No global opt-out signal is sent, which notifies third parties to not sell or share user data collected before consent.

**E. Plaintiff's Experience**

69. Plaintiff visited the Website in September 2024 to shop for a product and was unaware of the secret spyware being used to surveil visitors and monetize their personal information. Plaintiff is both (1) genuinely interested in the goods, services, and information available on Defendant's Website, and (2) a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law. The Ninth Circuit recently made exceptionally clear that it is "necessary and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, and that Courts must not make any impermissible credibility or standing inferences against them. *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

70. At the time of Plaintiff's September 2024 visit to the Website, the Website failed to present any type of a pop-up cookie consent banner notifying Plaintiff about either Defendant's Privacy Policy applicable to its Website or requesting Plaintiff's assent to the Website's use of any cookies to collect Plaintiff's information about either Plaintiff's device or about Plaintiff's interactions with the Website. In other words, during Plaintiff's visit to the Website, there was no cookie banner or CMP displayed on the Website.

71. In other words, the Website failed to provide a "Notice at Collection" of personal information in compliance with the CCPA, (Cal. Civ. Code § 1798.100(a)(1)-(3)), and California's regulation at 11 C.C.R. § 7012 at that time, which are part of the California Consumer Privacy Act Regulations. 11 C.C.R. § 7000(a). Such Regulations define "Notice at Collection" to mean "the notice given by a business to a consumer at or before the point at which a business collects personal information from the consumer as required by Civil Code section 1798.100, subdivisions (a) and (b), and specified in these regulations." 11 C.C.R. § 7001(q).

72. Section 7012 provides, "The Notice at Collection shall be made readily available where consumers will encounter it at or before the point of collection of any

personal information." 11 C.C.R. § 7012(c). Such regulation provides an "[i]llustrative example" as follows: "When a business collects consumers' personal information online, it may post a conspicuous link to the notice on the introductory page of the business's website and on all webpages where personal information is collected." 11 C.C.R. § 7012(c)(1). Section 7012 provides, "If a business does not give the Notice at Collection to the consumer at or before the point of collection of their personal information, the business shall not collect personal information from the consumer." 11 C.C.R. § 7012(d).

73. Because of the absence of a "Notice at Collection" on the homepage of the Website during her September 2024 visit, as a California resident, Plaintiff reasonably relied upon the absence of such "Notice at Collection" to indicate that the Website was not collecting, using, or sharing Plaintiff's personal information with any third parties during such visit.

74. During Plaintiff's September 2024 visit, third party cookies began to collect information about Plaintiff's device and Plaintiff's interactions with the Website the moment that Plaintiff landed on the Website.

75. Plaintiff continues to desire to browse content featured on the Website. Plaintiff would like to browse websites that do not omit to disclose cookies and tracking technologies via a Notice of Collection required under California law.

76. As mentioned above, however, the Website's cookie banner and CMP are currently misconfigured.

77. If the Website was programmed to honor users' requests to reject all non-essential cookies and tracking technologies, Plaintiff would likely browse the Website again in the future, but will not do so until then. Plaintiff regularly visits websites that feature content similar to that of the Website. Because Plaintiff does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website complies with California law, Plaintiff will be unable to rely on Defendant's Website when browsing the Website in the future absent an injunction that prohibits Defendant from omitting required

disclosures on the Website. For example, the only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

78. Thus, legal damages are inadequate to remedy the imminent threat of future harm that Plaintiff faces. Only an injunction can remedy this threat of future harm.

**F. The Private Communications Collected by Defendant Are Valuable.**

79. The Private Communications that the Third Parties (and other third parties) track and collect by way of the cookies on the Website is valuable to Defendant as well as the Third Parties (and other third parties). Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its products to consumers, Defendant could use the data collected by the Third Parties to monitor users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendant to target online advertisements to users when they visit ***other*** websites, even those completely unrelated to Defendant and its products and services.

80. Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's products. On a broader scale, it enables Defendant to gain an understanding of trends happening across its brands and across the consumer electronics market. All of this helps Defendant further monetize its Website and maximize revenue by collecting and analyzing user data.

81. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[2] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id.* "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id.*

82. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

83. By aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant has unjustly enriched itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

## G. <u>The Tracking Pixels and Third Party Cookies are Trap and Trace Devices.</u>

84. Under the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq*. ("CIPA"), it is unlawful to use a "trap and trace" device without consent. The Tracking Pixels—when used to collect and transmit information about a website visitor's communications—fall squarely within the statutory definition of such a device.

85. CIPA § 638.50(c) defines a "trap and trace device" as: "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication."

86. CIPA makes it unlawful to install or use such a device without a court order or proper consent, even on a private communication system.

---

[2] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

87. The Tracking Pixels are a "process" that captures routing and addressing information. As shown above, it captures and transmits the IP address of the originating device, device identifiers such as cookies, device IDs, or browser fingerprints, URL referrer paths, headers, and session identifiers, and other dialing, routing, addressing, and signaling information that identifies the source of the user's electronic communication.

88. This data is the very type of "signaling information" contemplated by CIPA's definition of a trap and trace device. Just like a telephone trap and trace system captures the originating number, the Tracking Pixels identify the originating digital sender—Plaintiff—through the routing and addressing metadata automatically included in the HTTP(S) request. The same principle applies here: the Tracking Pixels and third party cookies are a 21st century analog to a telephone trap and trace device—monitoring the metadata of electronic communications without consent.

89. Defendant did not obtain Plaintiff's express or implied consent to be subjected to fingerprinting and de-anonymization via the Tracking Pixels or third party cookies for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a Court order allowing it to install the Tracking Pixels or third party cookies.

90. CIPA imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. Cal. P. Code § 637.2.

**H. <u>Defendant's Conduct is Highly Offensive To A Reasonable Person.</u>**

91. Defendant's "bait and switch" scheme—luring visitors to its Website by falsely promising that it will safeguard their privacy while secretly partnering with notorious data brokers (and other third party entities) to secretly track each visitor and sell their private information to the highest bidders—is highly offensive to a reasonable person for at least five reasons. **First**, it breaches trust and expectations—Defendant explicitly promised to protect Plaintiff's privacy, but secretly used the Tracking Pixels (and third party cookies) in direct contravention of its explicit assurances. **Second**, it involves deception because Defendant promises one thing but does the opposite. That kind of dishonesty makes the conduct more offensive than ordinary tracking because it

undermines autonomy and consent—cornerstones of digital privacy. **Third**, it occurs in a private and sensitive setting. **Fourth**, it enables unwanted third-party surveillance by allowing cross-site profiling and targeted advertising without Plaintiff's consent—something most people find invasive when done in secret. **Fifth**, it violates established privacy norms that companies will be transparent about tracking, obtain meaningful consent, and honor their privacy policies.

92. Defendant's conduct creates a genuine likelihood of serious harm to Plaintiff. Plaintiff is informed and believes and thereon alleges that the personal information Defendant surreptitiously harvested via the Tracking Pixels or third party cookies includes name, contact information, location data, browsing behavior, device fingerprints, and interests. This type of information can be—and has been—used for identity theft, targeted harassment, and manipulative advertising. Data brokers purchasing this information can assemble comprehensive profiles to discriminate, exploit, or endanger users, particularly vulnerable populations such as women, minors, and individuals seeking health services. The danger is not abstract: the FTC has warned that data sold to third parties may be used to expose sensitive locations like domestic violence shelters or reproductive clinics, as well as to facilitate stalking or physical tracking. Such practices impose serious privacy and safety risks, not mere discomfort.

93. Cross-device attribution is a technique used by data brokers and advertisers to link a person's activity across different devices—such as their phone, laptop, tablet, or smart TV. This means that even if someone switches from browsing on their phone to using a laptop, the data broker can still identify them as the same person.

94. Tracking pixels, which are tiny pieces of code embedded in websites or emails, are key to this. They quietly collect information like IP address, browser type, screen resolution, and behaviors like clicks or time spent on a page. When this data is combined with third-party data or identifiers (such as email hashes or cookies), it becomes possible to follow the user across multiple devices without their knowledge.

95. Lack of consent, visibility, or choice is a type of tracking that happens

behind the scenes. Users aren't shown any clear notice that cross-device tracking is happening. Often, even if privacy policies mention "personalized ads" or "analytics," they fail to disclose the true extent of this tracking, nor do they offer real choices (like opt-outs that actually work). That's why this practice has been criticized by regulators and privacy advocates as deceptive.

96. Courts and regulators (like the Federal Trade Commission and state Attorneys General) have increasingly recognized that undisclosed or misleading tracking practices—especially those that span across a person's devices and online life—are not just deceptive, but highly invasive.

97. This conduct is especially offensive when coupled with false privacy promises that Defendant will protect and respect user privacy. Courts have found that misleading consumers into thinking their privacy is respected—while secretly undermining that very privacy—is especially egregious and offensive.

98. The degree and setting of Defendant's intrusion is particularly severe—what sets Defendant's conduct apart is not just the nature of the information collected, but the context in which the intrusion occurred. The tracking took place in a purportedly trusted setting—Defendant's own corporate website—which explicitly assured Plaintiff that Plaintiff's privacy would be respected. Instead, Defendant implemented hidden surveillance code that began tracking Plaintiff without disclosure or authorization.

99. Defendant's motives and objectives were both deceptive and exploitative: the purpose of the intrusion further supports its offensiveness. Defendant did not track users for benign analytics or internal operations. Rather, Defendant partnered with data brokers known for trafficking in intimate and geolocation data—and did so to profit off of Plaintiff's personal information. This is not an isolated lapse in oversight; it is a deliberate business strategy premised on deception, surveillance, and commodification of user trust. Secretly surveilling users to profit from the sale of their personal data—while falsely promising not to—is the very definition of manipulative and predatory conduct.

100. There are no legitimate or countervailing interests or social norms that render the intrusion inoffensive. **First**, the data at issue—such as real-time location, unique identifiers, or finance-related browsing—is highly sensitive and context-dependent. **Second**, users cannot meaningfully consent to a practice they are never told about, especially when they are affirmatively misled. Moreover, there is no legitimate business or social interest in falsely promising privacy protections while secretly violating them. The only "interest" advanced by Defendant is financial profit derived from deception—an interest that cannot render the intrusion inoffensive under state and federal law.

101. The intrusion is "highly offensive." Taken together, the factors articulated by California courts—the severity of the intrusion, the deceptive setting, the potential for serious harm, the exploitative motive, and the lack of any countervailing justification—all weigh heavily in favor of a finding that the intrusion was highly offensive.

## V. CLASS ALLEGATIONS

102. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> All California citizens who visited Defendant's Website while physically in California and whose personal information was shared with third parties by Defendant without effective and informed prior consent.

103. NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be at least fifty. The exact identities of Class members may be ascertained by the records maintained by Defendant.

104. COMMONALITY: Common questions of fact and law exist as to all Class members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant shared Class Members' personal information with any

third party;

b. Whether Defendant obtain effective and informed consent to do so;

c. Whether Class members are entitled to statutory penalties; and

d. Whether Class members are entitled to injunctive relief.

105. TYPICALITY: As a person who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiff is asserting claims that are typical of the Class.

106. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

107. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

108. AMOUNT IN CONTROVERSY: Inclusive of all class member claims, Plaintiff estimates that the amount in controversy is approximately $3,000,000. The precise amount in controversy can be determined from Defendant's records..

## VI. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of the Federal Wiretap Act

### (18 U.S.C. § 2511)

109. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

110. The federal Wiretap Act creates criminal liability for "any person who … intentionally intercepts … any wire, oral, or electronic communication," or who "intentionally uses" such content "knowing or having reason to know that the information was obtained through" interception. 18 U.S.C. § 2511(1)(a) & (d).

111. The third-party cookies or tracking pixels installed on the Website were used to intercept the contents of communications between Plaintiff and the Website in real time, including HTTP requests, URLs visited, and other metadata exchanged as part of Plaintiff's interactions with the Website. These communications constitute "electronic communications" under 18 U.S.C. § 2510(12).

112. Defendant and/or its agents intentionally intercepted, or procured the interception of, these electronic communications using the cookies or tracking pixel technology, without Plaintiff's knowledge or consent.

113. The interception occurred contemporaneously with the transmission of the electronic communication, satisfying the "in transit" requirement under the Wiretap Act.

114. No exception under 18 U.S.C. § 2511(2)(d) applies because Plaintiff did not consent to the interception, and Defendant exceeded any purported authorization by misrepresenting the nature of the data collection.

115. Defendant acted with a tortious and unlawful purpose when it enabled and permitted a third-party data broker or other third party entities to intercept Plaintiff's electronic communications through the use of a tracking pixel embedded on Defendant's Website or via use of third party cookies embedded onto Plaintiff's browser or device. Under 18 U.S.C. § 2511(2)(d), even if one party to a communication consents, the Wiretap Act is violated if the interception is made for the purpose of committing any criminal or tortious act. Courts have recognized that surreptitious data collection in violation of privacy rights can satisfy this "tortious purpose" standard. In *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 607 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1684 (2021), the Ninth Circuit held that Facebook's interception of browsing activity via tracking technologies could constitute a violation of the Wiretap Act where the conduct was undertaken for the purpose of violating users' privacy rights, such as by committing the tort of intrusion upon seclusion. Here, Defendants' facilitation of a third-party's interception—despite promising to protect user privacy—was done with the purpose of enabling commercial exploitation of user data in violation of California

common law privacy rights, including intrusion upon seclusion. This renders the interception unlawful under § 2511(2)(d).

116. Defendant intended to disclose its Website visitors' personally identifiable communications to data brokers and other third parties so that it could deliver targeted advertisements to its customers despite promising to protect user privacy and despite the fact that the Tracking Pixels and other third party technology began to collect user data immediately upon webpage loading without user consent.

117. Defendant customized and deployed the third party code embedded on its Website, which allowed the transmission and storage of Tracking Pixels and/or third party cookies onto Plaintiff's device and browser, and, as a result, played an active role in the use of the code to intercept Plaintiff's electronic communications and knowingly and unlawfully used those intercepted communications to guide its advertising and marketing efforts.

118. As a result of this unlawful interception, Plaintiff is entitled to damages under 18 U.S.C. § 2520(c)(2)(A)-(B), including the greater of actual damages and any profits made by the violator as a result of the violation or statutory damages of the greater of $100 per day per violation or $10,000, punitive damages under 18 U.S.C. § 2520(b)(2), reasonable attorney's fees under 18 U.S.C. § 2520(b)(3), and equitable relief and declaratory relief under 18 U.S.C. § 2520(b)(1).

## SECOND CAUSE OF ACTION

### Violations of the California Trap and Trace Law

### Cal. Penal Code § 638.51

119. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

120. CIPA includes the following statement of purpose:

"The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy

resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

(Cal. Penal Code § 630.)

121. CIPA extends civil liability for various means of surveillance using technology, including the installation of a trap and trace device. Sections 638.50 and 638.51 of the California Penal Code are part of the CIPA.

122. California Penal Code § 638.51(a) provides that "a person may not install or use…a trap and trace device without first obtaining a court order…."

123. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

124. The data brokers' Tracking Pixels and the third party cookies and the corresponding software code installed by Defendant on its Website is each a "trap and trace device" because each "captures" "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiff's computer or device. (Cal. Penal Code § 638.50(c).)

125. At all relevant times, Defendant caused the data brokers' Tracking Pixels and other third parties' cookies and the corresponding software code—which are trap and trace devices—to be placed on browsers and devices, and/or to be used to transmit Plaintiff's IP address and user-agent information. *See Greenley v. Kochava,* 684 F. Supp. 3d 1024, 1050-51 (S.D. Cal. 2023); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 928-33 (N.D. Cal. 2024).

126. Some of the information collected by the Third Parties' (and other third parties') cookies and the corresponding software, including IP addresses and user-agent

information, does not constitute the content of Plaintiff's electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

127. Plaintiff did not provide her prior consent to Defendant's use of Tracking Pixels or third-party cookies and the corresponding software.

128. Defendant did not obtain a court order to install or use the Tracking Pixels or the third-party cookies and corresponding software to track and collect Plaintiff's IP address and user-agent information.

129. As a direct and proximate result of Defendant's conduct, Plaintiff suffered losses and was damaged in an amount to be determined at trial.

130. Pursuant to Penal Code § 637.2(a)(1), Plaintiff is also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

## THIRD CAUSE OF ACTION

### California Intrusion Upon Seclusion

131. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

132. To assert a claim for intrusion upon seclusion, Plaintiff must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

133. By permitting third-party cookies to be stored on consumers' devices, which enabled the data brokers (and other third parties) to track and collect Plaintiff's private communications and other personal information without obtaining prior consent from Plaintiff, Defendant intentionally intruded upon Plaintiff's solitude or seclusion. Defendant effectively placed the data brokers and other third parties in the middle of communications to which they were not invited, welcomed, or authorized. Plaintiff is informed and believes and thereon alleges that such private communications and/or other

personal information includes Plaintiff's browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

134. The data brokers' (and other third parties') tracking and collecting of Plaintiff's private communications on the Website using Tracking Pixels or third-party cookies that Defendant caused to be stored on Plaintiff's device—and to be transmitted to data brokers (and other third parties)—was not authorized by Plaintiff.

135. Plaintiff had an objectively reasonable expectation of privacy surrounding her private communications and personal information on the Website based on Defendant's promise that it would protect Plaintiff's privacy, as well as state criminal and civil laws designed to protect individual privacy.

136. Defendant's intentional intrusion into Plaintiff's private communications would be highly offensive to a reasonable person given that Defendant's promise that it would protect Plaintiff's privacy and its omission that Defendant caused data brokers' Tracking Pixels and third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even before Plaintiff had an opportunity to make her privacy preferences. Indeed, Plaintiff reasonably expected that by omitting any type of a cookie banner regarding privacy, Defendant would not cause any third-party cookies to be stored on her device or permit the data brokers or other third parties to obtain her private communications on the Website.

137. Defendant's conduct was intentional and intruded on Plaintiff's private communications on the Website.

138. Plaintiff has been damaged by Defendant's invasion of her privacy and is entitled to just compensation, including monetary damages. *See Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS, Doc. 670 (N.D. Cal. Sept. 4, 2025) (awarding $425,651,947 in actual damages in class action following jury verdict finding liability for invasion of privacy and intrusion upon seclusion claims).

139. Plaintiff seeks appropriate relief for that injury, including but not limited to, damages that will compensate her for the harm to her privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's privacy.

140. Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights and Plaintiff's rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## VII. PRAYER

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. For an order certifying that the action be maintained as a class action, that Plaintiff be designated as the class representative, and that undersigned counsel be designated as class counsel;
2. Declaratory relief;
3. Actual and statutory damages;
4. Punitive damages;
5. Reasonable attorneys' fees and costs;
6. An injunction to prevent the unlawful conduct alleged above; and
7. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated: November 12, 2025

PACIFIC TRIAL ATTORNEYS, APC

By: *_/s/ Scott J. Ferrell_*

Scott J. Ferrell

Attorneys for Plaintiff and the Putative Class